# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA
# MACON DIVISION

| | |
|---|---|
| JEREMY CHRISTENSEN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) CIVIL ACTION NO. 5:16-CV-76(MTT) |
| | ) |
| CITY OF WARNER ROBINS, GA, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Defendant City of Warner Robins has moved for summary judgment on Plaintiff Jeremy Christensen's claims. Doc. 14. As discussed below, the City's motion (Doc. 14) is **GRANTED**, and Christensen's claims are **DISMISSED with prejudice**.

## I. FACTS[1]

Christensen began working as a patrol officer for the Warner Robins Police Department on February 6, 2013. Docs. 14-3 ¶ 3; 16 at 40:9-14; 16-2 at 1. Christensen completed his required twelve-week certification training program, for which the City paid, on June 21. Docs. 14-3 ¶¶ 3-4; 16 at 48:13-20. On July 8, Christensen began the

---

[1] Unless stated otherwise, the facts are undisputed. Where the facts are disputed, on summary judgment, the Court must draw "all justifiable inferences" in favor of Christensen, the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). But facts contained in the City's statement of material facts (Doc. 14-2) which are not controverted by more than mere bare assertions by Christensen are considered undisputed for purposes of this motion. *See* Fed. R. Civ. P. 56(e) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion."); M.D. Ga. L.R. 56 ("All material facts contained in the movant's statement [of material facts] which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate."); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (requiring non-moving parties to produce evidence to rebut the moving party's evidence). Accordingly, even where a party purports to dispute a fact, the Court will note that it has considered the fact undisputed if no evidence supports the party's dispute.

twelve-week Field Training and Evaluation Program, where he worked and learned under experienced Field Training Officers.  Docs. 14-3 ¶ 4; 16 at 48:4-49:1; 16-2 at 4.  On September 2, Christensen experienced shooting pains and leg cramps while driving and, as a result, was instructed not to drive for the rest of the day.  Docs. 16 at 53:7-54:20; 16-2 at 23.  Despite undergoing some periods in which he did not drive because of similar episodes, Christensen completed the Field Training and Evaluation Program on October 4, 2013.  Docs. 16 at 57:17-58:12, 62:1-16; 16-2 at 38.  Christensen then began the one-year probationary period required for all new city employees.  Docs. 14-3 ¶ 5; 16 at 42:13-43:12; 16-1 at 54.[2]

Christensen experienced more shooting pains after reporting for work on October 8, 2013; also, his hands shook uncontrollably.[3]  Docs. 16 at 63:13-64:6; 21-16 at 9:13-13:1.  Accordingly, another officer drove him home.  *Id.*  Later that day, Captain Bryan Stewart sent Christensen a memorandum, informing Christensen that he would need a release form from a physician before returning to work.  Doc. 16-2 at 39.  Christensen then saw a physician, Dr. Mohammad Al-Shroof, who cleared him to return to light duty on October 11.  Doc. 16-2 at 42.  However, Dr. Al-Shroof told Christensen he could not

---

[2] Christensen's probationary period was extended by the amount of time he trained to qualify as a new police officer.  Docs. 14-3 ¶ 5; 16 at 42:13-43:12; 16-1 at 54.  Christensen purports to deny that his probationary period was extended.  *See* Doc. 21-1 ¶¶ 15-16 ("Without knowledge, and therefore, denied.").  But Christensen sets forth no evidence to controvert the City's evidence in the form of Ordinance 18-09, which states that newly-hired city employees serve a one-year probation period and, "in the case of new police officers only, the probationary period shall be extended by the same amount of time spent employed prior to entrance in mandate school, mandate school itself, orientation[,] and completion of the field training program."  Doc. 16-1 at 54 (emphasis removed).  Further, in his deposition, Christensen admitted that the ordinance extends police officers' probationary period.  Doc. 16 at 42:13-43:12.  Accordingly, the Court finds that it is uncontroverted that Christensen's probationary period extended to October 4, 2014, one year after his successful completion of the Field Training and Evaluation Program.

[3] After Christensen was discharged, Dr. Al-Shroof diagnosed him with a seizure disorder based on his symptoms and his reactions to seizure medication.  Doc. 16-2 at 111-12.

drive. *Id.* at 43. Police Chief Brett Evans then assigned Christensen to the Criminal Investigations Division (CID) to accommodate Christensen's inability to drive. Doc. 14-5 ¶ 3. In that light duty role, Christensen was assigned to call victims of crimes and document those communications in an electronic case management program. *Id.*; Doc. 16 at 76:4-24.

Between October 2013 and April 2014, Christensen updated the City about his doctor appointments, and the City continued to allow Christensen to perform light duty work. Docs. 14-3 ¶¶ 7-8; 16 at 77:2-79:18. On April 10, 2014, Dr. Al-Shroof signed a letter releasing Christensen from all restrictions except for driving a city vehicle. Doc. 16-2 at 46. The City kept Christensen in his light duty position with CID based on Dr. Al-Shroof's note. Docs. 14-3 ¶ 8; 16 at 84:8-11.

Here, the parties' accounts diverge somewhat. As discussed in a section below, four employment disputes arose that the City argues justified its discharge of Christensen. But Christensen argues that those justifications are pretext for the City's discriminatory motives for firing him.

Regardless, the parties agree that, on July 9, 2014, Christensen was transferred from CID to Teleserve, where he was also assigned light duty work, which required him to field phone requests for non-emergency police needs and to complete reports documenting the phone calls. Docs. 14-5 ¶ 6; 16 at 103:17-104:18. The parties also agree that the City informed Christensen that it was terminating his employment on July 23, 2014 for the reason that he was an "unsatisfactory probationary employee." Docs. 16 at 116:12-117:15; 16-2 at 59.

On December 10, 2014, Christensen filed a charge of employment discrimination with the Equal Employment Opportunity Commission, and the EEOC issued Christensen a right to sue letter on November 17, 2015. Doc. 16-2 at 114-15. Christensen then filed this lawsuit, claiming that the City violated his rights under the Americans with Disabilities Act and the Rehabilitation Act by treating Christensen differently because of his perceived disability and by refusing to accommodate Christensen's disability, which "le[d], at least in part, to Plaintiff's termination." Doc. 1 ¶¶ 1, 3, 25-26, 28.[4]

The City now moves for summary judgment on those claims, arguing that, as a matter of law, Christensen (1) is not a "qualified individual" pursuant to the ADA or RA; (2) cannot prove that the City terminated his employment for discriminatory reasons rather than legitimate, non-discriminatory reasons; and (3) cannot prove that the City failed to reasonably accommodate his disability. Doc. 14-1.

## II. SUMMARY JUDGMENT STANDARD

**A.     Summary Judgment Standard Generally**

A court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine dispute of material fact exists, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted). A material fact is any fact relevant or necessary

---

[4] Christensen also originally pursued claims under the Family and Medical Leave Act, but the parties jointly stipulated that those claims be dismissed with prejudice. Doc. 10.

to the outcome of the suit. *Id.* at 248. And a factual dispute is genuine "if the evidence is such that a reasonably jury could return a verdict for the non[-]moving party." *Id.*

**B.    ADA and RA Claims**

Pursuant to the Americans with Disabilities Act and the Americans with Disabilities Act Amendments Act of 2008, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "Discriminating" as prohibited by the ADA in the employment context includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." 42 U.S.C. § 12112(b)(5)(A). But in cases alleging a failure to make reasonable accommodations, the employer's duty to provide a reasonable accommodation is not triggered until the employee makes a "specific demand" for an accommodation. *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir.1999).

Section 504 of the Rehabilitation Act prohibits any program or activity receiving federal financial assistance from discriminating against an otherwise qualified person based "solely by reason of her or his disability." 29 U.S.C. § 794(a). The standard for determining liability under the RA is the same as the standard under the ADA, except that, under the RA a plaintiff must prove that he suffered an adverse employment action

"solely by reason of" the plaintiff's disability. *Ellis v. England,* 432 F.3d 1321, 1326 (11th Cir.2005) (citations omitted).

**C.    Burden-Shifting Framework for Discrimination Claims Based on Circumstantial Evidence**

Like many plaintiffs pursuing claims of employment discrimination, Christensen does not rely on direct evidence of discrimination. As the parties agree, Christensen instead relies on circumstantial evidence to prove his case. *See, e.g.*, Docs. 14-1 at 14; 21 at 13. Accordingly, the burden-shifting analysis established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies. *See Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1226 (11th Cir.1999) ("The familiar burden-shifting analysis of Title VII employment discrimination actions is equally applicable to ADA claims." (citation omitted)). Under the *McDonnell-Douglas* approach, the plaintiff must first establish a prima facie case of discrimination; to establish a prima facie case, Christensen must prove by a preponderance of the evidence that he "(1) is disabled, (2) is a qualified individual, and (3) was subjected to unlawful discrimination because of [his] disability." *Id.* (citation omitted).[5]

If Christensen establishes a prima facie case, a presumption of discrimination is created, and the City has the burden of articulating legitimate, non-discriminatory reasons for the termination and alleged failure to accommodate Christensen. *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). At this stage, the City "need not persuade the [C]ourt that it was *actually* motivated by the proffered

---

[5] *But see Sneed v. Ken Edwards Enters., Inc.*, 2009 WL 10672371, at *1 (N.D. Ga.) (noting that the third prong as stated in *Hilburn* would require the plaintiff to "prov[e] his entire case as part of his prima facie case" and that "the practice of the Eleventh Circuit, if not the language of the Eleventh Circuit," requires the plaintiff to show only that an adverse employment action was taken as the third prong of the prima facie case).

reasons" but must instead produce evidence sufficient to raise a genuine issue of fact as to whether it discriminated against Christensen.  *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012) (emphasis added) (quotation marks and citations omitted).  If the City does so, Christensen can still avoid summary judgment if he produces sufficient evidence from which a reasonable jury could conclude that the City's articulated non-discriminatory reasons are pretext for discrimination.  *Cleveland*, 369 F.3d at 1193.  If a defendant articulates more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive summary judgment.  *Chapman v. Al. Transport*, 229 F.3d 1012, 1037 (11th Cir. 2000) (citation omitted).

### III. DISCUSSION

Christensen asserts claims against the City for (1) discriminatory termination under the ADA and the RA, and (2) failure to accommodate his disabilities under the ADA and the RA.  In its summary judgment motion, the City does not argue that Christensen is not "disabled" pursuant to the Acts.  *See generally* Doc. 14-1.  The City argues that Christensen's claims fail because, as a matter of law, Christensen (1) is not a "qualified individual" pursuant to the ADA or RA; (2) cannot prove that the City terminated his employment for discriminatory reasons rather than legitimate, non-discriminatory reasons; and (3) cannot prove that the City failed to reasonably accommodate his disability.

**A.**     **Whether Christensen is a "Qualified Individual"**

"The term 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  "For the purposes

of this subchapter, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.*

As a matter of law, Christensen is not a qualified individual because he was hired as a patrol officer, driving is an essential function of a patrol officer, and Christensen cannot perform that essential function. The City cites Chief Evans's affidavit testimony that driving is an essential function of a patrol officer, and—while Christensen purports to deny that driving is an essential function in his response to the City's statement of material facts—Christensen cites no evidence to support his conclusory denial. Doc. 14-3 ¶ 8; *see* Docs. 14-2 ¶ 40 ("Driving a City vehicle is an essential duty of being a patrol officer."); 21-1 ¶ 40 ("Without knowledge, and therefore, denied."). When the City terminated his employment in July 2014, Christensen was not able to perform the essential patrol officer function of driving; indeed, Christensen confirmed in his deposition that he was "not able to perform the job of patrol officer" at that time because he could not drive. Docs. 14-2 ¶ 92; 16 at 136:8-14; 21-1 ¶ 92.

In his brief, Christensen does not argue that driving is not an essential function of a patrol officer. Rather, he argues that his ten months of light duty work for the City constitute "clear[] evidence that Plaintiff not only had the prerequisites for the job, but also that—with a worksite accommodation that prevented [presumably, Christensen means 'relieved'] him from driving—he was able to perform the essential functions of the job" as a patrol officer. Doc. 21 at 9-10. The Court is not sure what this argument is. The City argues that Christensen "fundamentally misunderstands the law and record

when he contends . . . that he is a qualified individual with a disability because he was able to perform the essential functions of a police officer 'with a worksite accommodation that prevented him from driving.'" Doc. 23 at 4 (citing Doc. 21 at 9-10). That may be so. Or perhaps Christensen is attempting to fashion the argument that, when the City placed him on light duty in jobs that did not require him to drive, it somehow removed or waived driving as an essential function of a patrol officer. Or perhaps Christensen is attempting to argue indirectly that driving was not, in fact, an essential function of a patrol officer. Whatever Christensen is trying to argue, his argument fails.

The City accommodated Christensen's disability by giving him light duty work that did not require him to drive. Docs. 14-3 ¶ 7; 16 at 75:19-22, 176:10-17; 21-12 at 9:23-10:7. That accommodation did not enable him to perform the essential function of a patrol officer; he still could not drive. Christensen admits that these light duty positions were not generally filled by patrol officers, and Christensen testified that when patrol officers filled the positions they were only temporary, for officers who required temporary light duty assignments due to health. Doc. 16 at 177:24-179:6. Christensen can point to no patrol officer who was given indefinite light duty as a result of injury or illness. *See* Doc. 16 at 154:23-156:19 (Christensen's deposition, in which he testified that he had "no personal knowledge" but "assume[d]" that the other patrol officers put on light duty were eventually returned to their regular duty jobs). And neither the ADA nor the RA requires employers to create permanent light duty positions when the accommodation eliminates an essential function of the job. *See, e.g.*, *Frazier-White v. Gee*, 818 F.3d 1249, 1256 (11th Cir. 2016) ("Defendant was not required by the ADA to

create a permanent light-duty position especially for Plaintiff."); *Sutton v. Lader*, 185 F.3d 1203, 1211 (11th Cir. 1999) (same for RA); *see also Lucas v. W.W. Grainger, Inc.*, 257 F.3d 1249, 1260 (11th Cir. 2001) ("While it is true that the ADA may require an employer to restructure a particular job by altering or eliminating some of its marginal functions, employers are not required to transform the position into another one by eliminating functions that are essential to the nature of the job as it exists." (citations omitted).

Further, the City's past accommodations, which exceeded the requirements of the ADA, do not bind the City to anything outside the requirements of the ADA. In *Holbrook v. City of Alpharetta*, for example, the plaintiff police detective argued in part that, even though he could not drive and therefore could not perform the essential police detective function of on-site investigation, he could effectively perform the job with reasonable accommodation, as demonstrated by the fact that the defendant had taken measures to accommodate him in the past. 112 F.3d 1522, 1527 (11th Cir. 1997). The Eleventh Circuit rejected that argument, holding as follows:

> [T]here appears to be little doubt that, for quite some time and perhaps with relatively minor disruption or inconvenience, the [defendant] was able to accommodate [the plaintiff] with respect to those essential functions he concedes he cannot perform without assistance. It is equally apparent, however, that the [defendant]'s previous accommodation may have exceeded that which the law requires. We do not seek to discourage other employers from undertaking the kinds of accommodations of a disabled employee as those performed by the [defendant] in [the plaintiff]'s case; indeed, it seems likely that the [defendant] retained a productive and highly competent employee based partly on its willingness to make such accommodations. However, we cannot say that the [defendant]'s decision to cease making those accommodations that pertained to the

> essential functions of [the plaintiff]'s job was violative of the ADA.

*Id.* at 1528. Just as in *Holbrook*, Christensen's inability to drive, which is an essential function of a patrol officer, meant that he was not a qualified individual, regardless of the City's previous accommodation of his disability.

Because, as a matter of law, Christensen cannot show that with a reasonable accommodation he could perform the essential patrol officer duty of driving, he has failed to establish a prima facie case of discrimination.

**B.     Wrongful Termination Claim**

Christensen claims that the City violated his rights under the ADA and RA by discharging him because of his disability. Doc. 1 ¶¶ 25-29. Even if Christensen were a qualified individual and had otherwise established a prima facie case, the City has proffered legitimate non-discriminatory reasons for terminating his employment, based on four employment disputes, which Christensen cannot rebut. The Court discusses each dispute in turn.

In his role at CID, Christensen was assigned to call victims of crimes and document those communications in an electronic case management program. Docs. 14-5 ¶ 3; 16 at 76:4-24. In early June 2014, Christensen's supervisor, Lieutenant Lance Watson, questioned Christensen about the status of the supplemental reports he was assigned to upload to the CID's electronic case management program, giving rise to the first circumstance the City cites as non-discriminatory justification for its termination of Christensen's employment. Docs. 14-6 ¶ 4; 16 at 85:10-86:11. Christensen only entered ten supplemental reports into the system but had been assigned 270 matters. Docs. 14-6 ¶ 4; 16 at 86:6-11. Christensen told Watson that "most" of the information

from his phone calls was in a separate notepad and not in the system. Doc. 16 at 86:12-87:4. Watson stated in an affidavit that he then instructed Christensen to complete the reports and correctly document the information, but Christensen testified in his deposition that Watson did not request he complete the reports. Docs. 14-6 ¶ 4; 16 at 88:19-22.

Regardless, the parties agree that when Watson checked the system two weeks later, he saw that Christensen had still not completed the reports in the system and asked Christensen where he could find the notebook with the information. Docs. 14-6 ¶ 5; 16 at 88:15-22. Watson stated in his affidavit that he found the notepad but that there were no reports or notes of calls, and that Christensen gave him no explanation for this. Doc. 14-6 ¶ 5. On the other hand, Christensen testified that he told Watson where he thought he left the notebook but that Watson did not find the notebook. Doc. 16 at 88:23-89:15. Further, Christensen testified that he does not know what happened to the notebook and did not discuss it further with Watson. Doc. 16 at 88:23-89:15. The parties agree that, as a result of the failure to complete the supplemental reports, other CID employees had to be reassigned to make the call-backs that were undocumented. Docs. 14-5 ¶ 4; 16 at 89:16-20.

A second employment dispute arose around the same time, this one relating to Christensen's time records. Christensen missed work from June 23 through June 27 of 2014 because he had a stomach bug, and he communicated that he needed to stay home to Watson via text message. Docs. 16 at 91:12-93:19; 16-2 at 47-49. When he returned to work, Christensen submitted a Required Application for Leave form, and under "explanation of code required," he wrote, "25-27 Jun Sick Family" but did not

mention June 23 or 24. Doc. 16-2 at 50. Christensen testified that he did not know he was required to complete the form for the days he missed. Doc. 16 at 97:12-15. Christensen's timesheet for the pay period listed him as being sick from June 25-27 but present on June 23 and 24, working from 8:00 AM to 11:00 AM and then 12:00 PM to 5:00 PM on both days. Doc. 16-2 at 51.d

Here, Christensen's account diverges from that of his colleagues. Christensen testified that he told the administrative assistant to whom he gave his timesheets that he was also out on June 23 and 24 and to deduct that time from Christensen's annual leave. Doc. 16 at 98:11-100:6. But the administrative assistant, Tonie Mules, stated in an affidavit that she found Christensen's Required Application for Leave form, which stated that he had been absent from June 25-27, at her desk and entered Christensen's time as if he worked on June 23 and 24. Doc. 14-7 ¶ 3. Christensen testified that when he received his next pay statement, he saw that his timesheet had been filled out incorrectly and asked Mules about it. Doc. 16 at 100:20-101:2. Christensen testified that Mules told him "that it would sort itself out" by the next pay period. *Id.* at 101:2-4. But Mules stated that she "never spoke with Mr. Christensen regarding his absences." Doc. 14-7 ¶ 3. Christensen then testified that he did not learn whether the City fixed the timesheet error because, by the time of his next pay statement, his employment had been terminated. Doc. 16 at 103:9-16.

A third employment dispute arose after Christensen had been transferred from CID to Teleserve. On July 9, 2014, Christensen was transferred from CID to Teleserve, where he was also assigned light duty work; his tasks there included taking phone calls from citizens with non-emergency police needs and completing reports documenting the

phone calls.  Docs. 14-5 ¶ 6; 16 at 103:17-104:18.  Christensen was instructed to complete the reports immediately, but he failed to complete a report for a July 15 phone call until he was ordered to do so by Captain Joe Wetherington on July 21.  Docs. 14-5 ¶ 6; 14-8 ¶¶ 3-4, at 5; 16 at 104:7-18.  Christensen testified that sometimes he would need to immediately return to the phone before completing the previous report, which would require him to go back and complete the report after he was done with the next call.  Doc. 16 at 104:10-18.  He testified that the missing July 15 report happened on "one of those days where it was nonstop phone calls" and that he rectified the issue as soon as he was notified by submitting the report.  Id. at 104:19-105:11.

Finally, a fourth dispute arose after Christensen worked on Saturday July 19, 2014.  Doc. 16 at 105:15-106:01.  He told another administrative assistant who finalizes time reports, Susan Martin, that he began work at 8:00 AM and finished at 6:00 PM with a break for lunch from 11:00 AM to 12:00 PM.  Docs. 14-9 at ¶ 3; 16 at 107:21-108:15.  But security footage and his admission at his deposition show that in fact Christensen arrived for work at 8:47 AM and left at 5:17 PM.  Docs. 14-8 ¶ 5; 16 at 109:22-113:5; 16-2 at 53-58.[6]

Christensen testified that he logged 8:00 AM rather than 9:00 AM by mistake and thought, until he was presented with contrary evidence at his deposition, that he had arrived at "like a quarter to 8:00."  Doc. 16 at 114:11-19.  He further testified that he logged leaving at 6:00 PM even though he left closer to 5:00 PM because he thought

---

[6] Christensen purports to deny this assertion, without reference to specific evidence.  See Doc. 21-1 ¶ 81 ("Without knowledge, and therefore, denied.  See Response to 70.").  But testimony and documentary evidence prove this assertion, Christensen does not set forth specific evidence to controvert that evidence, and in his deposition Christensen himself admitted that the footage shows him arriving at the above times.  Docs. 16 at 109:22-113:5; 16-2 at 53-58.  Accordingly, the Court finds that there is no genuine dispute as to when Christensen arrived at or left work on July 19.

that if he worked through lunch he could take the extra hour at the end of the day.  Doc. 16 at 116:4-7.  However, in the same deposition, Christensen admitted that he never confirmed his impression with a supervisor.  *Id.* at 116:8-11.

The City contends that it terminated Christensen's employment because he was an unsatisfactory probationary employee, citing "serious concerns about [Christensen]'s credibility" in light of the four lapses discussed above.  Doc. 14-1 at 12; *see also* Docs. 14-5 ¶¶ 8-9 (Captain Chris Rooks's affidavit stating that he recommended Christensen's release "for various reasons, including his failure to accurately account for his time, and for his failure to properly document reports as required when he was assigned light duty work in the CID and Teleserve"); 14-3 ¶ 9 (Chief Evans's affidavit stating that he terminated Christensen's employment based on Captain Rooks's recommendation and his own knowledge of Christensen's performance); 14-5 at 8 (memorandum Captain Rooks prepared for Chief Evans, documenting Christensen's lapses).

The Court finds that the City has proffered valid, non-discriminatory reasons for terminating Christensen's employment.  Taking Christensen's version of events, he (1) failed to timely input into the system 260 out of 270 CID supplemental reports to which he was assigned and then lost the notebook with the handwritten reports, requiring other CID employees to do that work in addition to their own workloads; (2) logged his sick leave such that it was filed incorrectly but then took steps to try to correct it; (3) submitted a Teleserve report six days after the call, even though he was supposed to fill reports out instantly; and (4) logged two hours that he did not work because he mistakenly thought that he arrived an hour earlier than he did and that he could log an extra hour if he worked through lunch, though he never confirmed that with a superior.

Even Christensen's versions of events clearly justify the City's view that Christensen was an unsatisfactory probationary employee whose credibility was a cause of serious concern, especially in light of police officers' special responsibilities and power.

Accordingly, the burden shifts back to Christensen to establish that the City's reasons constitute pretext.  To establish pretext pursuant to the burden-shifting analysis, plaintiffs must point to "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [defendants'] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence."  *Springer v. Convergys Customer Mgmt. Grp., Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (quotation marks and citations omitted).  Further, "[i]f the proffered reason is one that might motivate a reasonable employer," plaintiffs "must meet [that reason] head on and rebut it," rather than disputing the wisdom of the employer's reasoning.  *Id.* at 1350 (internal quotation marks and citation omitted); *see also Chapman*, 229 F.3d at 1030 (stating that, in the employment discrimination context, "[f]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions," but rather their "inquiry is limited to whether the employer gave an honest explanation of its behavior" (quotations omitted)).

Christensen argues that he "received no discipline, no counseling, no criticism of job performance" at the time of the incidents discussed above and disputes "all four (4) allegations against him."  Doc. 21 at 14-15.  He points out that he was well-liked and received positive feedback for his job performance.  *Id.* at 1 (citing Docs. 21-14 at 11:15-18; 21-15 at 13:23-14:3).  Christensen further argues that he was never even informed of the four specific allegations above until he applied for unemployment

benefits and the City challenged the application, and he was the only employee to be disciplined for a payroll discrepancy or to have his timesheets audited or video surveillance reviewed. Doc. 21 at 7-8, 16 (citing Doc. 21-15 at 11:11-17, 12:5-7). Finally, Christensen contends that the memorandum Captain Chris Rooks prepared for Chief Evans, documenting the justifications for Christensen's termination, is undated and therefore a jury could find that it was prepared as post hoc justification for his termination. Docs. 21 at 15-16.

As discussed above, even with all inferences drawn in his favor, Christensen accrued a number of mistakes as an employee. Despite his argument that he disputes all four allegations against him, Christensen does not dispute that he erred but instead argues that his errors were justified. But the proffered reasons could motivate a reasonable employer to terminate Christensen's employment, even taking his explanations as true. Although Christensen argues that he was the only employee fired for timesheet errors, he testified that he had no personal knowledge of any similarly-situated, non-disabled employees who were treated better than he was treated; nor has he pointed to any similarly-situated employees outside of his protected class who were not disciplined for infractions comparable to his. Doc. 16 at 153:24-156:19. And the fact that the memorandum Rooks wrote for Evans was undated does not create the possibility that a jury could find it unworthy of credence: Rooks testified that he prepared the memorandum on July 22, and Christensen does not dispute the contents of the memorandum—he merely disputes the contention that his errors were a sufficient justification for his termination. Doc. 21-15 at 12:22-24. In sum, none of Christensen's arguments establish "such weaknesses, implausibilities, inconsistencies, incoherencies

or contradictions in [the City's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence" to survive summary judgment. *Springer*, 509 F.3d at 1348 (11th Cir. 2007) (internal quotation marks and citation omitted).

Because the Plaintiff's claims arising from his termination fail under the ADA, which prohibits employment discrimination "on the basis of disability," it follows that the claims certainly fail under the RA, which requires the higher showing that an employer discriminated against an employee "*solely* by reason of her or his disability." 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a) (emphasis added).[7]

## C. Failure to Accommodate Claim

Christensen also claims that the City violated his rights under the ADA and RA by failing to reasonably accommodate his disability. Doc. 1 ¶¶ 25-29. But in fact the City accommodated Christensen's disability beyond what was required under the ADA and the RA, and the City would be due summary judgment even if Christensen were a qualified individual.

Prior to Christensen's termination, the City accommodated Christensen's disability. Between October 2013, when Christensen was hired, and July 2014, when Christensen's employment was terminated, the City allowed Christensen to perform light duty work to accommodate his inability to drive city vehicles, first with CID and later with Teleserve. Docs. 14-3 ¶¶ 7-8; 16 at 76:22-79:18, 103:17-104:18. Christensen argues that the City failed to accommodate him because it terminated his employment rather than allowing him to continue to work light duty. Doc. 21 at 11-12.

---

[7] Christensen's claims under the RA arguably fail even on his pleadings, which allege that the "events set forth herein le[d], *at least in part*, to Plaintiff's termination." Doc. 1 at ¶ 28 (emphasis added).

As discussed above, Christensen was not a qualified individual because he could not perform the essential functions of the job of patrol officer with or without reasonable accommodation. Although the City had nevertheless accommodated Christensen prior to his termination, the ADA and the RA did not mandate it to do so. Neither the ADA nor the RA require employers to create permanent light duty positions. *See, e.g.*, *Frazier-White*, 818 F.3d at 1256 ("Defendant was not required by the ADA to create a permanent light-duty position especially for Plaintiff."); *Sutton*, 185 F.3d at 1211 (same for Rehabilitation Act). And Christensen has not provided a reasonable accommodation that the City failed to provide; indeed, the accommodation the City did provide, and upon which he relies, is unreasonable as a matter of law because it eliminates an essential job function. *See Lucas*, 257 F.3d at 1259-60 ("An accommodation is 'reasonable' and necessary under the ADA only if it enables the employee to perform the essential functions of the job." (citations omitted)). Further, there is no evidence that Christensen requested accommodation above what the City provided, so even if the City had owed him more accommodation, such a duty was never triggered. *See Gaston*, 167 F.3d at 1363.

Because, as discussed above, the standard for determining liability is the same under the RA as under the ADA except that the RA requires a showing that the plaintiff suffered an adverse employment action "solely by reason of" the plaintiff's disability, the City is due summary judgment on Christensen's claims for failure to accommodate under both Acts. 42 U.S.C. § 12112(a); 29 U.S.C. § 794(a).

## IV. CONCLUSION

For the reasons discussed above, the City's motion (Doc. 14) is **GRANTED**. Christensen's claims are accordingly **DISMISSED with prejudice**.

**SO ORDERED**, this 6th day of March, 2018.

S/ Marc T. Treadwell
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT
